J-S89031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  D.T.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  D.M., MOTHER | No. 1303 EDA 2016 |

Appeal from the Order March 24, 2016
in the Court of Common Pleas of Philadelphia County Family Court
at No(s): CP-51-AP-0000331-2015
CP-51-DP-0000333-2010

BEFORE: SHOGAN, MOULTON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED January 12, 2017**

D.M. ("Mother") appeals from the order entered in the Philadelphia County Court of Common Pleas terminating her parental rights to D.T.M. ("Child") (born in 2005).  Mother contends the Department of Human Services ("DHS") failed to establish the elements of 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  We affirm.

We adopt the facts as set forth by the trial court.  **See** Trial Ct. Op., 5/27/16, at 1-4.[1]  DHS filed a petition to involuntarily terminate Mother's

---

[*] Former Justice specially assigned to the Superior Court.

[1] We note that Dr. William Russell testified at the October 15, 2015 hearing. Mother's counsel stipulated that Dr. Russell was an expert in the field of parenting capacity evaluations.  N.T., 10/15/15, at 20.  Dr. Russell provided DHS with a parenting capacity evaluation for Mother and a bonding evaluation.  **Id.**  He testified that he followed "the APA standards set forth for forensic psychologists[.]"  **Id.** at 42.  Jessica Merson testified that she was a child abuse investigator for DHS.  **Id.** at 80.  Shereena Johnson of DHS was assigned to Child's case.  N.T., 11/2/15, at 10.  Stephanie Reily was the case manager from the Wordsworth Community Umbrella Agency ("CUA").  N.T., 1/8/16, at 4.

parental rights. Hearings were held on October 15, 2015, November 2, 2015, and January 8, 2016. The trial court changed the goal from reunification to adoption and terminated Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). *See* Order, 3/24/16. Mother simultaneously filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), and the trial court filed a responsive opinion.

Mother raises the following issues for our review:

> 1. Did [DHS] sustain their burden that Mother's rights should be terminated when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

> 2. Was there sufficient evidence presented to establish that it was in the best interest of [C]hild to terminate Mother's parental rights?

Mother's Brief at 4.[2]

We review appeals from the involuntary termination of parental rights according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility

---

[2] Appellant raised eight issues in her Pa.R.A.P. 1925(b) statement of errors complained of on appeal. *See Commonwealth v. Dunphy*, 20 A.3d 1215, 1218 n. 2 (Pa. Super. 2011) (holding claims raised in Rule 1925(b) statement but not identified in statement of questions presented or developed in argument section of brief abandoned on appeal).

determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

A trial court's decision regarding the termination of parental rights is controlled by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination

of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511)

(some citations omitted).

Section 2511(a) provides in pertinent part:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a

- 4 -

reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

25 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b). "We note that, initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*) (citation omitted).

In termination cases, the burden is upon DHS to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid.

We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

In the case at bar, the trial court found that the facts alleged in DHS's petition as to subsections 2511(a)(1), (2), (5), (8) and (b) were established by clear and convincing evidence. Trial Ct. Op., 7/12/13, at 3-11. In *In re B.L.W.*, 843 A.2d 380 (Pa. Super. 2004) (*en banc*), this Court opined: "While the trial court found that [DHS] met its burden of proof under each section quoted above, we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights." *Id.* at 384 (citations omitted). We consider whether the trial court erred in terminating Mother's parental rights under Section 2511(a)(8).

> We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to § 2511(a)(8), as follows:

> In order to terminate parental rights pursuant to 23 [Pa.C.S.] § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

> *In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275–1276 (Pa. Super. 2003). . . . "**Notably, termination under Section 2511(a)(8), does not require an evaluation of Mother's willingness or ability to remedy the conditions that led to placement of her children**." *Id.* at 511.

*In re K.M.*, 53 A.3d 781, 789 (Pa. Super. 2012) (emphasis added).

We have observed the following about the "needs and welfare" analysis pertinent to Sections 2511(a)(8) and (b):

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re C.L.G.*, 956 A.2d at 1008-09 (Pa. Super. 2008).

Mother contends the trial court erred in terminating her parental rights pursuant to Section 2511(a)(8). "Ms. Riley's extensive testimony that there were no barriers to reunification clearly established that the conditions which

led to the removal or placement of [C]hild were no longer present."

Appellant's Brief at 18.

In the case *sub judice*, the trial court opined:

> Child in this case has been in DHS custody since March 22, 2012, for a total of four years. Child was removed because Mother was a safety threat to Child's life. Mother abused drugs and physically abused Child. Child has chronic respiratory problems which were made worse by Mother's failure to attend doctor's appointments. Mother has not acknowledged and accepted her role in endangering Child's life. Mother has not attended Child's medical appointments, despite court orders. Mother is not involved in Child's schooling—Mother does not attend school meetings. Mother spends all the time at her visits talking with Child about school, but does not know where Child attends school or goes to therapy. Mother has attended most court hearings. Mother has not attended visits with Child in over three weeks because she had become upset with CUA. The court heard credible testimony from Dr. Russell that Mother would not be able to parent safely for a year or more. Mother has not successfully completed her drug and alcohol program. Child is currently placed in a safe and stable pre-adoptive home. Foster Mother provides for all Child's needs, and has a loving bond with Child. The DHS social worker testified that it would be in Child's best interest to terminate Mother's parental rights and allow Foster Mother to adopt Child. Child refers to Foster Mother as "grandmom" and in the past expressed a desire to remain with Foster Mother. Child needs permanency. The conditions leading to removal continue to exist, as Mother is not able to acknowledge her role in child's life-threatening medical issues. The testimony of DHS's witness was unwavering and credible. Mother is not ready, willing or able as of today to parent [Child].

Trial Ct. Op. at 11 (citations omitted). We discern no abuse of discretion in

the trial court's determination that termination of parental rights pursuant to

Section 2511(a)(8) would best serve the needs and welfare of Child. ***See In***

*re S.P.*, 47 A.3d at 826-27. We defer to the trial judge's credibility determinations. *See id.* The totality of the circumstances warrants termination pursuant to Section 2511(a)(8). *See In re K.M.*, 53 A.3d at 789; *In re R.N.J.*, 985 A.2d at 276.

We now consider the needs and welfare of Child as required by section 2511(b). *See In re C.L.G.*, 956 A.2d at 1008-09. Mother argues the trial court erred in its conclusion pursuant to Section 2511(b), relying upon the testimony of Ms. Reily, the CUA case manager. Appellant's Brief at 20-21.

With regard to subsection 2511(b), this Court has stated:

> The trial court also must discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. The extent of the bond-effect analysis necessarily depends upon the unique facts and circumstances of the particular case.
>
> \* \* \*
>
> Moreover, the mere existence of an emotional bond does not preclude the termination of parental rights. . . .
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re K.M.*, 53 A.3d at 791 (citations omitted).

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is

- 9 -

> not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted).

Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763-64 (Pa. Super. 2008) (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting")).

The trial court determined that the facts of this case supported a finding that termination would best serve Child's needs and welfare. The court opined:

> Dr. Russell, who performed a bonding evaluation on Mother and Child, testified that they have a definite bond, but not a parental one. Mother has not been the primary caretaker in Child's life for over three and a half years. More recently, Mother has not visited with Child in three weeks because she was upset with CUA. Child has developed a resilient and independent personality as a result, and Dr. Russell testified that Child would not suffer any irreparable harm if Mother's parental rights were terminated. Child has displayed fear of returning to Mother's care, and did not want to reunify with her. Mother has not acknowledged Child's past medical neglect or the part Mother played in allowing Child's condition to worsen to life—threatening levels. Child has a strong, loving bond with Foster Mother, who seeks to adopt Child. Foster Mother provides for all of Child's needs, including her extensive medical needs. Child refers to Foster Mother as "grandmom" and in the past expressed a desire to remain with Foster Mother. It would be in Child's best interest to be adopted by foster Mother.

Trial Ct. Op. at 12.

After a careful review, we find the record supports the trial court's factual findings, and the court's conclusions are not the result of an error of law or an abuse of discretion with regard to Section 2511(b). *See In re S.P.*, 47 A.3d at 826-27. We defer to the trial court's credibility determinations. *See id.*; *see also In re K.Z.S.*, 946 A.2d at 763-64. We, therefore, affirm the order terminating Mother's parental rights with regard to Child under Sections 2511(a)(8) and (b).

Order affirmed.

- 11 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/12/2017

**IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION**

In the Interest of D.M., a Minor     :      CP-51-DP-0000333-2010
                                     :      CP-51-AP-0000331-2015

                                     :      FID: 51-FN-340698-2009

                                     :
APPEAL OF: D.M., Mother         :      1303 EDA 2016

**OPINION**

**Fernandes, J.:**

Appellant D.M. ("Mother") appeals from the order entered on March 24, 2016, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Mother's parental rights to D.M. ("Child") pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b). Maureen Pié, Esq., counsel for Mother, filed a timely Notice of Appeal with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b).

**Factual and Procedural Background:**

The family in this case has been known to DHS since 2009. Mother began receiving In-Home Protective Services ("IHPS") since December 23, 2009, because of Child's health problems and Mother's drug use. Mother stopped engaging with IHPS in July 2010. On July 30, 2010, DHS filed a dependent petition for Child. The court adjudicated Child dependent and ordered DHS to supervise. On November 23, 2010, Mother was still not compliant with court orders and the court ordered Child to be removed from Mother's home. Mother did not cooperate, and fled the home with Child in order to hide from DHS. DHS hired a private investigator and the petition remained open.

On March 21, 2012, DHS received a Child Protective Services ("CPS") report that Child had been hospitalized at the Intensive Care Unit, suffering from metapneumovirus and asthma, and that Child was at risk for life-threatening respiratory failure. On March 22, 2012, DHS obtained an Order for Protective Custody ("OPC") and placed Child in a foster home. Child was adjudicated

dependent on March 30, 2012, and fully committed to DHS custody. On February 5, 2013, the court found that aggravated circumstances existed as to Mother, who had engaged in aggravated physical neglect of Child. The case was transferred to a Community Umbrella Agency, ("CUA") which developed a Single Case Plan ("SCP"). Mother's objectives under the SCP were to visit Child consistently, obtain appropriate housing, take a parenting capacity evaluation, stabilize her mental health and attend the Clinical Evaluation Unit ("CEU") for random drug screens. On June 3, 2015, DHS filed a petition to involuntarily terminate Mother's parental rights and change Child's permanency goal to adoption.

The termination and goal change trial was held over four days. On October 15, 2015, Dr. Russell, who had performed a parenting capacity evaluation and bonding evaluation, testified. Dr. Russell testified that Child had been taken into care because of medical issues and Mother's substance abuse. (N.T. 10/15/15, pg. 26). Mother had not held a job in over a decade, and had a long past history of mental health issues and drug abuse. (N.T. 10/15/15, pgs. 27-28). Mother was having hallucinations of voices and spirits as well as racing and paranoid thoughts. Mother displayed poor judgment and limited insight into her situation. (N.T. 10/15/15, pgs. 29-31, 58). Mother showed poor coping skills and refused to acknowledge that Child had suffered any medical neglect at all while they were on the run from DHS. (N.T. 10/15/15, pgs. 43-44, 48-49). Mother had recently relapsed on illegally-acquired Xanax. (N.T. 10/15/15, pgs. 52-53). Dr. Russell testified that the bonding evaluation showed a relationship between Mother and Child, but that Child was fearful of Mother being her primary caregiver and preferred to stay in her current placement. (N.T. 10/15/15, pgs. 35-36, 60). Child would suffer no irreparable harm if Mother's parental rights were terminated. (N.T. 10/15/15, pgs. 37, 65). Dr. Russell testified that Mother would not be capable of parenting safely within the next year, and recommended Mother engage in more therapy, abstain from drugs and obtain employment and housing. (N.T. 10/15/15, pgs. 33-34). The DHS child abuse investigator testified that when abuse was alleged in March 2012, Child had not seen a doctor since November 2010. Child had been admitted to the emergency room forty-six times since birth, and had been admitted to the intensive care unit three times with life-threatening respiratory conditions during the time Mother was on the run from DHS. Child had been medicated by Mother without a prescription. (N.T. 10/15/15, pg. 81-83). Following Child's three intensive care hospitalizations, Mother had not taken Child to the required follow-up appointments. (N.T.

10/15/15, pg. 87). Child alleged that Mother would physically discipline her, hitting Child with belts, hangers and flip-flops. (N.T. 10/15/15, pgs. 83-85). Child also alleged that Mother would smoke crack cocaine in front of her, that Child witnessed sexual activity in the home and that Child slept in the bed with Mother and Mother's paramour. (N.T. 10/15/15, pg. 88).

On November 2, 2015, the DHS social worker testified that Child had chronic asthma, and that Mother had evaded DHS's private investigator for two years. (N.T. 11/2/15, pg. 11). During the time the case was assigned to DHS, in November 2013, DHS developed a Family Service Plan ("FSP") for Mother. Mother's objectives were to obtain mental health and drug and alcohol treatment, obtain appropriate housing, visit with Child and attend Child's medical appointments. (N.T. 11/2/15, pg. 13). The DHS social worker had visited Mother's house in 2013, and she testified that it smelled strongly of marijuana, and marijuana was visible in the home. Child knew what crack cocaine was because Mother smoked it in the home. (N.T. 11/2/15, pg. 18). Mother had tested positive for Xanax in 2013. (N.T. 11/2/15, pgs. 21, 36-37). While hiding from DHS, Mother had asked neighbors for asthma medications for Child. (N.T. 11/2/15, pg. 26). Child had been fed only Oodles of Noodles while in Mother's care. (N.T. 11/2/15, pg. 27). Child had been to fifteen secret hospital visits while evading DHS. (N.T. 11/2/15, pgs. 31-32). Mother stipulated to DHS's request for a finding of aggravated circumstances, but the court ordered that reasonable efforts continue to reunify Mother and Child. (N.T. 11/2/15, pg. 35). Child is currently placed with a foster caregiver, Foster Mother, who is very loving and takes care of Child's medical needs. It would be in Child's best interest to be adopted by Foster Mother. (N.T. 11/2/15, pgs. 27-28). Foster Mother testified that she had cared for Child for three and a half years. She administered all seven medications Child required, took Child to therapy and ensured she received tutoring to stay current in school. (N.T. 11/2/15, pgs. 44-45). Foster Mother seeks to adopt Child. Child has been hospitalized only once since coming into Foster Mother's care. Foster Mother allowed Mother to visit Child in Foster Mother's home, but recently Mother had become upset and had not attended a visit in three weeks. (N.T. 11/2/15, pgs. 51, 54-55).

On January 8, 2016, the CUA social worker testified as a witness for Mother that Mother is appropriate at her visits with Child. The CUA social worker began working on the case in October or November 2014. (N.T. 1/8/16, pgs. 11-12). They eat food and talk about Child's school. (N.T. 1/8/16, pgs. 12-13, 15). Mother wants to attend Child's medical appointments, but CUA has not

been able to inform Mother of them in time. (N.T. 1/8/16, pg. 16). Mother is engaged in a dual diagnosis program. She was initially enrolled in Intensive Outpatient, but has been stepped down to Outpatient. Mother's drug screens in 2015 were all negative. She was positive for benzodiazepines on October 17, 2014. (N.T. 1/8/16, pgs. 17-18). The CUA social worker testified that Child wants to go home with Mother, and that CUA has no concerns or fears about reunification. The CUA social worker testified that there was no barrier to reunification. (N.T. 1/8/16, pg. 19-20, 26). Mother's housing is clean, safe and appropriate. (N.T. 1/8/16, pgs. 28-29). Mother testified that she hadn't taken Child to the doctor because she was on the run, evading DHS. (N.T. 1/8/16, pg. 31). Mother testified she was drug-free and engaged in therapy, and would continue in her current treatments. (N.T. 1/8/16, pgs. 32-34). Mother testified that she used drugs because she was stressed, and was stressed because of lies told about her in court. (N.T. 1/8/16, pg. 36). Mother testified that she has a job, but also testified that she is not currently working or being paid. (N.T. 1/8/16, pgs. 39-40). Mother's only source of income is what she gets from doing small jobs helping out her sister. (N.T. 1/8/16, pgs. 40-41). Mother does not know what school Child attends, or where Child attends therapy. (N.T. 1/8/16, pg. 42).

On March 24, 2016, the court terminated Mother's parental rights under 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b). The court found there would be no irreparable harm to Child if Mother's rights were terminated. Because the court found that it would be in Child's best interest, Child's permanency goal was changed to adoption. On April 25, 2016, Maureen Pié, Esq., counsel for Mother, filed this appeal.[1]

**Discussion:**

On appeal, Mother alleges that the trial court erred in determining that:

1. DHS had met its burden of proof by clear and convincing evidence that Mother evidenced a settled purpose of relinquishing her claim to the child or has refused or failed to perform parental duties, for at least six months immediately preceding the filing of the petition. On the contrary, Mother has consistently attended court hearings and has been compliant with her FSP/SCP objectives for many months prior to the filing of the Goal Change and Termination Petitions. Further, the only social worker witness (Ms. Riley) who had any

---

[1] Father's parental rights were also terminated. Father has not appealed.

contact with Mother within a year and a half of the hearing, testified that there were no barriers to reunification.

2. DHS had met its burden of proof that Mother has shown repeated and continued incapacity, abuse, neglect or refusal, of that such incapacity, abuse, neglect or refusal causing his [*sic*] child to be without essential parental care, control or subsistence necessary for the child's physical or mental well-being; see *supra* paragraph 1. See also DHS exhibit 7.

3. DHS had met its burden of proof that the conditions and causes of any such incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother; see *supra* paragraph 1. See also DHS exhibit 7.

4. DHS had met its burden of proof that the conditions which led to the removal of the child continue to exist; in fact the contrary was proved.

5. DHS had met its burden of proof that the services or assistance reasonably available to Mother are not likely to remedy the conditions which led to the removal of the child within a reasonable period of time and erred in determining that DHS made reasonable efforts to reunify this family; on the contrary, DHS fought reunification from early in the case.

6. DHS had met its burden of proof that services or assistance were reasonably available to Mother; including *inter alia*, that recommendations helpful to Mother by the parenting capacity evaluator were ignored.

7. DHS had met its burden of proof that changing the child's permanency goal to adoption and terminating Mother's rights would best serve the needs and welfare of the child.

For the purposes of this opinion, Mother's issues will be consolidated into the following: Did the trial court err or abuse its discretion in terminating Mother's parental rights and changing the permanency goal to adoption? The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a), which provides the following grounds for §2511(a)(1):

(a) **General rule** - The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntarily terminate parental rights the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month time period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as testimony that is so clear, direct weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue.

The petition for involuntary termination was filed against Mother on June 3, 2015. Mother's FSP and SCP objectives were to obtain mental health and drug and alcohol treatment, obtain appropriate housing, visit with Child and attend Child's medical appointments. (N.T. 11/2/15, pg. 13). During the six-month period prior to the filing of the petition, Mother completed a parenting capacity evaluation and bonding evaluation. Dr. Russell, who performed these evaluations, testified that Mother would not be able to parent Child safely within a year, even if Mother continued to be involved in her dual diagnosis program. (N.T. 10/15/15, pgs. 33-34). Mother displayed poor judgment and coping skills. She did not fully understand how she had ended up in her current situation. Mother had been having racing, paranoid thoughts and hearing hallucinations of voices and spirits. (N.T. 10/15/15, pgs. 29-31, 58). Mother refused to acknowledge that Child had suffered any medical neglect at all while they were on the run from DHS. (N.T. 10/15/15, pgs. 43-44, 48-49). Mother is permitted to be present for the Child's medical appointments. However, Mother has not attended any since the beginning of the case. The CUA social worker admitted she has not given Mother timely notice of the appointments, but also made excuses that Mother could not attend because it would conflict with Mother's other programs. (N.T. 1/8/16, pg. 16). Mother did not know Child's school or therapy provider. (N.T. 10/15/15, pgs. 37-38), (N.T. 1/8/16, pg. 42). Child has had asthma since birth and has been to the emergency room forty-six times with seventeen admissions to the hospital for serious health issues, all during the time Mother was on the run, hiding from DHS. (N.T. 10/15/15, pgs. 82-84). Mother has an affirmative

duty to perform parental duties. Mother is aware of Child's medical needs but has never seen the need to avail herself to attend medical appointments that she had noticed. Mother was unable to acknowledge that she had played a primary role in Child's medical neglect. Dr. Russell was credible. The CUA social worker was not present during Dr. Russell's evaluation of Mother. (N.T. 1/8/16, pg. 21). Although Mother physically attends her programs, Mother has not successfully completed her drug and alcohol program. Mother admitted she was recently stepped down from intensive outpatient to regular outpatient. (N.T. 1/8/16, pg. 41). Considering the whole history of the case since Child came into care on March 22, 2012, Mother still has not successfully completed her FSP or SCP objectives. Additionally, because the court heard credible testimony that Mother would not be capable of providing safe and permanent care for Child within a year, the trial court did not abuse its discretion by finding clear and convincing evidence that Mother, by her conduct, had refused and failed to perform parental duties, so termination under this section was proper.

The trial court also terminated Mother's parental rights under the Adoption Act at 23 Pa.C.S.A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect or refusal of the parent that causes the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. _Adoption of C.A.W._, 683 A.2d 911, 914 (Pa. Super. 1996).

Child in this case has chronic asthma. Mother did not take Child to the doctor regularly, and Child's illness progressed to life-threatening levels. Mother then fled DHS for two years. (N.T. 11/2/15, pg. 11). While on the run from DHS, Mother did not take Child to the doctor because she was afraid they would be caught. (N.T. 1/8/16, pg. 31). Mother asked neighbors to supply her with medicine. (N.T. 11/2/15, pg. 26). Mother fed Child only ramen noodles for the two years they were hiding from DHS. (N.T. 11/2/15, pg. 27). Mother has an extensive history of drug use and mental health problems. Mother tested positive for benzodiazepines on October 17, 2014. (N.T. 1/8/16, pg. 18). Mother has never been Child's primary caregiver since 2012. Mother has had her parental rights to a number of other children involuntarily terminated, and stipulated that aggravated circumstances existed due to Mother's medical neglect of Child. (N.T. 10/15/15, pgs.

34, 64), (N.T. 11/2/15, pgs. 35-36). Child alleged in the past that Mother smoked crack cocaine in front of her, had sex in front of her and beat her with hangers. (N.T. 10/15/15, pgs. 83-85, 88), (N.T. 11/12/15, pgs. 18, 52). Mother has recently engaged in a dual diagnosis program. (N.T. 1/8/16, pg. 32). However, Mother does not acknowledge how she contributed to Child's medical neglect – Mother believes that there was no medical neglect. (N.T. 10/15/15, pgs. 48-49). Mother spends all the time at her visits talking with Child about school, but does not know where Child attends school. (N.T. 1/8/16, pg. 15, 42). Mother also does not know where Child is going to therapy or whether Child has an IEP, though Mother attended most of the court hearings. Mother has not visited Child in three weeks because she was upset with CUA. (N.T. 11/2/15, pgs. 54-55). Mother said that she had turned to drugs in the past because she was stressed. Mother left the courtroom during the trial because she could not stand to hear testimony which she called "lies", since they caused too much stress. (N.T. 1/8/16, pg. 36). Mother has heard hallucinated voices and spirits, and laughed at random and inappropriate times. Mother displayed poor judgment and impulse control. (N.T. 10/15/15/, pgs. 29-31, 43-44, 58, 61). While Mother has been technically compliant with her SCP goals, she has not manifested the ability to parent Child in a safe and permanent manner. (10/15/15, pgs. 34, 56). Mother would be unable to remedy the causes of her incapacity in order to provide Child with essential parental care, control or subsistence necessary for her physical and mental well-being. Mother refuses to perform parental duties focusing on Child's needs. Child needs permanency, which Mother cannot provide at this moment. Consequently, DHS has met its burden under §2511(a)(2) of the Adoption Act.

Mother also appeals the trial court's termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has

recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

Child in this case has been in DHS custody since March 22, 2012, for a total of four years. Child was removed from Mother's care due to Mother's drug use and aggravated medical neglect which exacerbated Child's life-threatening respiratory problems. (N.T. 11/2/15, pg. 11, 31-33). Mother stipulated that aggravated circumstances existed. (N.T. 11/2/15, pgs. 35-36). However, Mother does not acknowledge the medical neglect and physical abuse she caused. (N.T. 10/15/15, pgs. 48-49). Even when asked by her own attorney, Mother only indicated Child was removed due to her drug abuse. (N.T. 1/8/16, pgs. 30-31). Mother's SCP objectives have been the same since 2013, and included attending Child's medical appointments. Mother has attended one medical appointment since 2012. Mother is not involved in Child's schooling – Mother does not attend meetings for Child's remedial education in math or reading. (N.T. 11/2/15, pg. 45). Mother spends all the time at her visits talking with Child about school, but does not know where Child attends school or whether Child attends therapy. (N.T. 1/8/16, pg. 15, 42). Mother had not held a job in over ten years. When the termination petition was filed she had no source of income. (N.T. 10/15/15, pg. 27). To provide for Child and be able to parent her safely, Mother must have a source of income. Dr. Russell testified that without a financial plan he could not recommend reunifying Child with Mother. (N.T. 10/15/15, pg. 39) Despite the involvement of CUA case managers and social workers, referrals to the Achieving Reunification Center ("ARC") and input from therapists, Mother did not obtain employment or apply for Social Security Disability. (N.T. 10/15/15, pg. 41). Mother testified that she had been employed since October 2015 by a staffing agency. Mother testified that she was drawing a paycheck and working 6:15 to 2:00, then testified that she was not working any hours and was not receiving a paycheck. Mother testified that her only current source of income is the little she gets from helping her sister with small jobs. (N.T. 1/8/16, pgs. 39-41). The court heard credible testimony that Mother would not be able to parent safely for a year or more. (N.T. 10/15/15, pg. 34). This case originally began when Mother ran away with Child to escape DHS supervision. DHS has made numerous referrals to ARC, the CEU

and other services over the four-year life of this case. Mother engaged with services only recently. (11/2/15, pgs. 12-13, 20-21, 33). Because of Mother's delay in engaging with services, she is not yet ready to parent. The trial court properly found that Mother was not able to remedy the conditions which led to Child's placement within a reasonable time. Child is currently placed with Foster Mother, who wishes to adopt her. Foster Mother has cared for Child since Child came into care in 2012. Foster Mother keeps up with Child's medical needs, necessitating only one hospitalization since Child began living with Foster Mother, makes sure she is fed, administers seven medications, arranges for Child's therapy and tutoring and attends meetings at Child's school. (N.T. 11/2/15, pgs. 44-47). Foster Mother and Child have a very loving bond, and it would be in Child's best interest to terminate Mother's parental rights and allow Foster Mother to adopt her. (N.T. 11/2/15, pgs. 27-28). Mother has been given more than ample time to place herself in a position to be a parent to Child. Child needs stability. Child cannot wait for Mother any longer to get her parenting ability together. The more delay in permanency, the more detrimental it becomes to Child.(N.T. 10/15/15, pg. 68). As a result the trial court found that termination of Mother's parental rights was in the best interest of Child for her physical, intellectual, moral and spiritual well-being. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under this section was also proper.

The trial court also terminated Mother's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.,* 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love comfort, security and stability. *In re Bowman,* A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.,* 835 A.2d 387, 397 (Pa. Super. 2003).

Child in this case has been in DHS custody since March 22, 2012, for a total of four years. Child was removed because Mother was a safety threat to Child's life. Mother abused drugs and physically abused Child. Child has chronic respiratory problems which were made worse by Mother's failure to attend doctor's appointments. (N.T. 10/15/15, pgs. 80-83). Mother has not acknowledged and accepted her role in endangering Child's life. (N.T. 10/15/15, pgs. 48-49). Mother has not attended Child's medical appointments, despite court orders. (N.T. 11/2/15, pg. 45) (N.T. 1/8/16, pg. 16). Mother is not involved in Child's schooling – Mother does not attend school meetings. (N.T. 11/2/15, pg. 45). Mother spends all the time at her visits talking with Child about school, but does not know where Child attends school or goes to therapy. Mother has attended most court hearings. (N.T. 1/8/16, pg. 15, 42). Mother had not attended visits with Child in over three weeks because she had become upset with CUA. (N.T. 11/2/15, pgs. 54-55). The court heard credible testimony from Dr. Russell that Mother would not be able to parent safely for a year or more. (N.T. 10/15/15, pg. 34). Mother has not successfully completed her drug and alcohol program. (N.T. 1/8/16, pg. 41). Child is currently placed in a safe and stable pre-adoptive home. Foster Mother provides for all Child's needs, and has a loving bond with Child. The DHS social worker testified that it would be in Child's best interest to terminate Mother's parental rights and allow Foster Mother to adopt Child. (N.T. 11/2/15, pgs. 27-28, 44-47). Child refers to Foster Mother as "grandmom" and in the past expressed a desire to remain with Foster Mother. (N.T. 10/15/15, pgs. 35-36, 90). Child needs permanency. The conditions leading to removal continue to exist, as Mother is not able to acknowledge her role in Child's life-threatening medical issues. The testimony of DHS's witness was unwavering and credible. Mother is not ready, willing or able as of today to parent the Children. (N.T. 10/15/15, pg. 34). Because the record contains clear and convincing evidence, the trial court did not abuse its discretion and termination under this section was also proper.

After a finding of any grounds for termination under section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. *In re Involuntary Termination* of *C.W.S.M.* and *K.A.L.M.,* 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". *In re Adoption of T.B.B.* 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and

evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *In re K.Z.S.* at 762-763. However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Dr. Russell, who performed a bonding evaluation on Mother and Child, testified that they have a definite bond, but not a parental one. Mother has not been the primary caretaker in Child's life for over three and a half years. More recently, Mother has not visited with Child in three weeks because she was upset with CUA. (N.T. 1/8/16, pgs. 15, 42). Child has developed a resilient and independent personality as a result, and Dr. Russell testified that Child would not suffer any irreparable harm if Mother's parental rights were terminated. (N.T. 10/15/15, pgs. 35-36, 37, 65). Child has displayed fear of returning to Mother's care, and did not want to reunify with her. Mother has not acknowledged Child's past medical neglect or the part Mother played in allowing Child's condition to worsen to life-threatening levels. (N.T. 10/15/15, pgs. 35-36, 48-49), (N.T. 1/8/16, pgs. 30-31). Child has a strong, loving bond with Foster Mother, who seeks to adopt Child. Foster Mother provides for all Child's needs, including her extensive medical needs. (N.T. 11/2/15, pgs. 27-28, 44-47). Child refers to Foster Mother as "grandmom" and in the past expressed a desire to remain with Foster Mother. (N.T. 10/15/15, pgs. 35-36, 90). It would be in Child's best interest to be adopted by Foster Mother. (N.T. 11/2/15, pgs. 27-28). Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no positive parental bond, and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

Mother also alleges that the court erred in changing the Children's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest Of R.P. a Minor*, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward

placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply the instructions received. *In re R.T.*, 778 A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

The court heard credible testimony that Mother would not be psychologically prepared to care for Child full-time for a year or more. (N.T. 10/15/15, pg. 34). Mother does not have the capacity to parent. Mother still disputes whether her conduct was medical neglect. (N.T. 10/15/15, pgs. 48-49). Mother displayed erratic behaviors during the bonding evaluation, laughing at random times. (N.T. 10/15/15, pg. 61). Mother left the courtroom during the trial because she could not bear to her testimony against her, saying that the "lies" had caused her stress. (N.T. 1/8/16, pg. 36). Mother testified that she had been employed since October 2015 by a staffing agency. Mother testified that she was drawing a paycheck and working 6:15 to 2:00, then testified that she was not working any hours and was not receiving a paycheck. Mother testified that her only current source of income is the little she gets from helping her sister with small jobs. (N.T. 1/8/16, pgs. 39-41). Mother did not attend visitation for three weeks because of her anger at CUA, placing her own feelings above the needs of Child. (N.T. 11/2/15, pgs. 54-55). Mother is clueless where Child attends school or therapy, and does not avail herself for medical appointments. (N.T. 1/8/16, pgs. 16, 42). Child has been in a safe and permanent home with Foster Mother for four years. Foster Mother takes meticulous care of Child's medical needs. (N.T. 11/2/15, pgs. 44-48). It would be in Child's best interest to be adopted by Foster Mother. (N.T. 11/2/15, pgs. 27-28). The record established clear and convincing evidence that the change of permanency goal from reunification to adoption was proper.

**Conclusion:**

For the aforementioned reasons, the court properly found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b) since it would best serve Child's emotional needs and welfare. The court also properly found that changing Child's permanency goal from reunification to adoption was in Child's best interest. The trial court's termination of Mother's parental rights and change of goal to adoption was proper and should be affirmed.

By the court,

_____

Joseph Fernandes, J.